No. 25-30128

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

DEEP SOUTH TODAY, *doing business as* VERITE NEWS; GANNETT
COMPANY, INCORPORATED; GRAY LOCAL MEDIA,
INCORPORATED; NEXSTAR MEDIA, INCORPORATED; SCRIPPS
MEDIA, INCORPORATED; TEGNA, INCORPORATED,

*Plaintiffs-Appellees/Cross-Appellants,*

*v.*

LIZ MURRILL, *in her official capacity as* ATTORNEY GENERAL OF
LOUISIANA; ROBERT P. HODGES, *in his official capacity as*
SUPERINTENDENT OF THE LOUISIANA STATE POLICE; HILLAR C.
MOORE, III, *in his official capacity as* DISTRICT ATTORNEY OF EAST
BATON ROUGE PARISH,

*Defendants-Appellants/Cross-Appellees.*

_____

On Appeal from the United States District Court for the
Middle District of Louisiana
Case No. 3:24-cv-00623 (Hon. John W. deGravelles)

_____

## BRIEF FOR PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*[Caption Continued on Inside Cover]*

Grayson Clary
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Telephone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org

Scott L. Sternberg
M. Suzanne Montero
STERNBERG, NACCARI & WHITE, LLC
935 Gravier Street, Suite 1800
New Orleans, LA 70112
Telephone: (504) 324-1887
Facsimile: (504) 534-8961
scott@snw.law | suzy@snw.law

*Attorneys for Plaintiffs Deep South
Today*, d/b/a *Verite News, Gannett Co., Inc.,
Gray Local Media, Inc., Nexstar Media, Inc.,
Scripps Media, Inc., and TEGNA Inc.*

Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7839
KTownsend@gibsondunn.com

*Attorney for Plaintiff Deep South
Today*, d/b/a *Verite News*

DEEP SOUTH TODAY, *doing business as* VERITE NEWS; GANNETT
COMPANY, INCORPORATED; GRAY LOCAL MEDIA,
INCORPORATED; NEXSTAR MEDIA, INCORPORATED; SCRIPPS
MEDIA, INCORPORATED; TEGNA, INCORPORATED,

*Plaintiffs-Appellees/Cross-Appellants*,

*v.*

LIZ MURRILL, *in her official capacity as* ATTORNEY GENERAL OF
LOUISIANA; ROBERT P. HODGES, *in his official capacity as*
SUPERINTENDENT OF THE LOUISIANA STATE POLICE; HILLAR C.
MOORE, III, *in his official capacity as* DISTRICT ATTORNEY OF EAST
BATON ROUGE PARISH,

*Defendants-Appellants/Cross-Appellees.*

_____

The undersigned counsel of record certifies that the following listed

persons and entities as described in the fourth sentence of Rule 28.2.1 have

an interest in the outcome of this case. These representations are made in

order that the judges of this court may evaluate possible disqualification or

recusal.

**A. Plaintiffs-Appellees/Cross-Appellants**

Deep South Today, d/b/a Verite News

Gannett Co., Inc.

Gray Local Media, Inc.

Gray Television, Inc.

Nexstar Media, Inc.

Scripps Media, Inc.

E.W. Scripps Company

TEGNA Inc.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the

undersigned counsel of record certifies as follows:

Deep South Today, d/b/a Verite News, is a 501(c)(3) nonprofit

corporation with no parent corporation and no stock.

Gannett Co., Inc. is a publicly traded company and has no affiliates

or subsidiaries that are publicly owned.

Gray Local Media, Inc. is owned by Gray Television, Inc.  Gray Television, Inc. is a publicly traded corporation and no publicly held corporation holds 10% or greater ownership interest in its stock.

Nexstar Media, Inc. has no corporate parent company and no publicly held corporation has a 10% or greater ownership interest in its stock.

Scripps Media, Inc. is a Delaware corporation.  The E.W. Scripps Company ("EWS") is the parent company of Scripps Media, Inc. ("SMI"). EWS is a public company and owns 100% of the outstanding capital stock of SMI.

TEGNA Inc. ("TEGNA") has no corporate parent company. BlackRock, Inc., owns 10% or more of TEGNA's stock.

**B. Attorneys for Plaintiffs-Appellees/Cross-Appellants**

Grayson Clary
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005

Scott L. Sternberg
M. Suzanne Montero
STERNBERG, NACCARI & WHITE, LLC
935 Gravier Street, Suite 1800
New Orleans, LA 70112

*Attorneys for Deep South Today,* d/b/a *Verite News, Gannett Co., Inc., Gray Local Media, Inc., Nexstar Media, Inc., Scripps Media, Inc., and TEGNA Inc.*

Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071

*Attorney for Deep South Today,* d/b/a *Verite News*

## C. Defendants-Appellants/Cross-Appellees

Liz Murrill

Robert P. Hodges

Hillar C. Moore, III

# CERTIFICATE OF INTERESTED PERSONS
## (continued)

## D. Attorneys for Defendants-Appellants/Cross-Appellees

Elizabeth B. Murrill
J. Benjamin Aguiñaga
Zachary Faircloth
Caitlin A. Huettemann
OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802

Date: June 26, 2025

*/s/ Grayson Clary*
Grayson Clary
*Counsel of Record for*
*  Plaintiffs-Appellees*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellees agree that oral argument is appropriate in this case, where a novel state statute raises grave constitutional doubts under the Due Process Clause and the First Amendment.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ....................................... viii

TABLE OF AUTHORITIES ................................................................ xi

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ................................................... 7

STATEMENT OF THE ISSUES.......................................................... 8

STATEMENT OF THE CASE ............................................................ 9

    I.    Plaintiffs' newsgathering brings their journalists within 25 feet
        of law enforcement officers across Louisiana on a routine
        basis........................................................................................... 9

    II.   Louisiana adopts the 25-foot law.......................................... 13

    III.  The 25-foot law's impact on Plaintiffs and their journalism.............. 14

    IV.  Plaintiffs' lawsuit and the District Court's injunction. ....................... 17

STANDARD OF REVIEW .............................................................. 22

SUMMARY OF ARGUMENT ....................................................... 23

ARGUMENT ................................................................................... 25

    I.    The District Court correctly exercised jurisdiction. ........................... 25

        A.   Plaintiffs have standing to challenge the Act. ........................ 25

             1.    Plaintiffs have standing to bring a vagueness claim. ......... 26

             2.    Plaintiffs have standing to bring First Amendment
                 claims. ...................................................................... 30

B. Plaintiffs' claims are ripe. ..................................................35

C. All Defendants are proper parties. ...................................39

II. The Act is void for vagueness under the Due Process Clause. .........44

A. The Act affords arbitrary discretion to law enforcement officers to decide which of the countless individuals who approach within 25 feet should be ordered to retreat. ...............45

B. The Act fails to provide members of the public and the press fair warning of the conduct that will prompt an order to retreat....................................................................53

III. The Act violates the First Amendment. .................................56

A. The Act violates the First Amendment as applied to Plaintiffs' peaceful, nonobstructive newsgathering in public places. ...................................................................57

B. The Act violates the First Amendment on its face. .....................65

IV. The District Court's preliminary injunction was otherwise proper.......................................................................69

CONCLUSION .......................................................................71

CERTIFICATE OF COMPLIANCE...................................................73

CERTIFICATE OF SERVICE............................................................74

# TABLE OF AUTHORITIES

**Cases**

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
846 F.3d 391 (D.C. Cir. 2017) ..........................................................37

*Agnew v. Gov't of District of Columbia*,
920 F.3d 49 (D.C. Cir. 2019) ......................................................47, 48

*Am. C.L. Union of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ..............................................34, 35, 64

*Ariz. Broads. Ass'n v. Brnovich*,
626 F. Supp. 3d 1102 (D. Ariz. 2022) ............................................63

*Bell v. Keating*,
697 F.3d 445 (7th Cir. 2012) ..............................................46, 48, 55

*Blitch v. City of Slidell*,
260 F. Supp. 3d 656 (E.D. La. 2017) ..............................................39

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ..............................................22, 44, 71

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) ......................................................69

*Braidwood Mgmt., Inc. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) ..............................................32, 35, 36

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ......................................................31, 58

*Calhoun v. Collier*,
78 F.4th 846 (5th Cir. 2023) ..........................................................40

*Casas v. Am. Airlines, Inc.,*
304 F.3d 517 (5th Cir. 2002) ...............................................................7

*Citizens United v. FEC,*
558 U.S. 310 (2010) .............................................................................72

*City of Chicago v. Morales,*
527 U.S. 41 (1999) .......................................................................*passim*

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ...............................................................5, 38, 66

*Coates v. City of Cincinnati,*
402 U.S. 611 (1971) ...........................................................................56

*Ctr. for Individual Freedom v. Carmouche,*
449 F.3d 655 (5th Cir. 2006) .............................................................30

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ...........................................................................52

*Doe I v. Landry,*
909 F.3d 99 (5th Cir. 2018) ...............................................................67

*Freedom Path, Inc. v. IRS,*
913 F.3d 503 (5th Cir. 2019) .............................................................38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,*
528 U.S. 167 (2000) ...........................................................................28

*Gen. Land Office v. Biden,*
71 F.4th 264 (5th Cir. 2023) .............................................................28

*Gilbert v. Donahoe,*
751 F.3d 303 (5th Cir. 2014) ..........................................................2, 3

*Gitlow v. New York,*
268 U.S. 652 (1925) ...........................................................................53

*Glik v. Cunniffe,*
    655 F.3d 78 (1st Cir. 2011) ................................................................63

*Gore v. Turner,*
    563 F.2d 159 (5th Cir. 1977) ...............................................................71

*Holder v. Humanitarian L. Project,*
    561 U.S. 1 (2010) .....................................................................*passim*

*Hudson v. City of New Orleans,*
    174 F.3d 677 (5th Cir. 1999) ...............................................................39

*Hulbert v. Pope,*
    70 F.4th 726 (4th Cir. 2023) ...............................................................60

*Johnson v. United States,*
    576 U.S. 591 (2015) ...........................................................................45

*Jordan v. Jenkins,*
    73 F.4th 1162 (10th Cir. 2023) .....................................................31, 59

*Justice v. Hosemann,*
    771 F.3d 285 (5th Cir. 2014) .................................................32, 33, 34

*Kay v. White,*
    286 F. Supp. 684 (E.D. La. 1968).......................................................53

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ................................................................*passim*

*Marcavage v. City of Chicago,*
    659 F.3d 626 (7th Cir. 2011) ...............................................................60

*McClelland v. Katy Indep. Sch. Dist.,*
    63 F.4th 996 (5th Cir. 2023) ...............................................................52

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ...........................................................60, 62, 64

*Mi Familia Vota v. Ogg*,
   105 F.4th 313 (5th Cir. 2024) ...........................................5, 40, 41, 42

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .................................................................68, 72

*Nat'l Press Photographers Ass'n v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) ...........................................*passim*

*Netflix, Inc. v. Babin*,
   88 F.4th 1080 (5th Cir. 2023) ............................................71

*Nicodemus v. City of South Bend*,
   137 F.4th 654 (7th Cir. 2025) ...........................................*passim*

*Perkins v. Hart*,
   No. 22-30456, 2023 WL 8274477 (5th Cir. Nov. 30, 2023) ....................62, 63

*Pouillon v. City of Owosso*,
   206 F.3d 711 (6th Cir. 2000) ..............................................60

*Reed v. Lieurance*,
   863 F.3d 1196 (9th Cir. 2017) ...........................................60

*Reporters Comm. for Freedom of the Press v. Rokita*,
   751 F. Supp. 3d 931 (S.D. Ind. 2024),
   *appeal docketed*, No. 24-2927 (7th Cir. Oct. 25, 2024) .............................*passim*

*Schenck v. Pro-Choice Network of W. N.Y.*,
   519 U.S. 357 (1997) .................................................................64, 65

*Seals v. McBee*,
   898 F.3d 587 (5th Cir. 2018) ............................................36

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
   467 U.S. 947 (1984) ..............................................................67

*Sessions v. Dimaya,*
 584 U.S. 148 (2018) ..............................................................52, 53

*Shuttlesworth v. City of Birmingham,*
 382 U.S. 87 (1965) ...................................................................*passim*

*Siders v. City of Brandon,*
 123 F.4th 293 (5th Cir. 2024) .................................................*passim*

*Smith v. Goguen,*
 415 U.S. 566 (1974) ...........................................19, 37, 38, 48

*Speech First, Inc. v. Fenves,*
 979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020) ....................30, 31, 35

*Steffel v. Thompson,*
 415 U.S. 452 (1974) ..............................................................33

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ..........................................................26, 36

*Terrell v. Allgrunn,*
 114 F.4th 428 (5th Cir. 2024) .................................................62

*Thornhill v. Alabama,*
 310 U.S. 88 (1940) ...........................................................38, 69

*Turner v. Lieutenant Driver,*
 848 F.3d 678 (5th Cir. 2017) ..............................................61

*United States v. Stevens,*
 559 U.S. 460 (2010) ................................................................6

*Vincent v. City of Sulphur,*
 805 F.3d 543 (5th Cir. 2015) ..............................................53

*Virginia v. Am. Booksellers Ass'n, Inc.,*
 484 U.S. 383 (1988) ..............................................................25

*White Hat v. Landry,*
    475 F. Supp. 3d 532 (M.D. La. 2020) ................................................43

*World Wide St. Preachers Fellowship v. Town of Columbia,*
    245 F. App'x 336 (5th Cir. 2007 ..............................................59, 60

**Statutes**

28 U.S.C. § 1292 ..............................................................................7

28 U.S.C. § 1331 ..............................................................................7

28 U.S.C. § 1343 ..............................................................................7

Fla. Stat. § 843.31 ..........................................................................57

Ind. Code § 35-44.1-2-14 ......................................................3, 51, 65

Ind. Code § 35-44.1-2-15 ..............................................................57

La. Rev. Stat. § 14:109 ............................................................*passim*

La. Rev. Stat. § 14:112.4 ................................................................13

La. Rev. Stat. § 40:1379 ..........................................................13, 41

La. Rev. Stat. § 40:2402 ..........................................................13, 42

**Other Authorities**

Ange Toussaint, *Governor Jeff Landry Signs Education Reform Bill,*
    KATC (June 19, 2024),
    https://perma.cc/J658-655E ......................................................10

Curt Sprang, *Two Dead in Mandeville Following Welfare Check Turned*
    *Police Shooting,* WGNO (July 6, 2024),
    https://bit.ly/4f5TcLS. ..............................................................11

Jessica Knox, *Heavy Police Presence Planned for LSU vs. Southern Game*,
 BRProud (Sept. 8, 2022),
 https://bit.ly/3LoBm9j ........................................................................10

Kenny Kuhn, *WWL Mardi Gras Parade Coverage from New Orleans*,
 4WWL (Feb. 13, 2024),
 https://perma.cc/4W3Z-2VQL...........................................................10

Louisiana Attorney General's Office and Orleans Parish District
 Attorney's Office Cooperative Endeavor Agreement (Feb. 5, 2024),
 https://perma.cc/7E2Z-W4QP ..........................................................43

Michael Scheidt & Trinity Velazquez, *Police Chief Puts More Cops on
 the Street After Baton Rouge Had 28 Shootings in March*,
 BRProud (Mar. 25, 2024),
 https://bit.ly/45ztZHB ......................................................................11

Michael Scheidt, *Louisiana Gov. Jeff Landry Signs Health Care Bills Into
 Law*, WGNO (June 25, 2024),
 https://bit.ly/3S9ivmF......................................................................10

Michelle Liu, *After Protest Crackdown, Some Students and Faculty
 Criticize Tulane's Approach to Pro-Palestinian Speech*,
 Verite News (May 6, 2024),
 https://perma.cc/Z6ZB-DP82 ...........................................................11

Raeven Poole, *Law Enforcement Agencies Raid Pro-Palestine Protest on
 Tulane University Campus*, WGNO (May 1, 2024),
 https://bit.ly/3XYmE0o......................................................................10

Recording of Oral Arg.,
 *Reporters Comm. for Freedom of the Press v. Rokita*, No. 24-2927
 (7th Cir. May 13, 2025), https://perma.cc/T4TS-ZX7M .........................23, 69

Talk 107.3, *Mornings with Brian Haldane: Liz Murrill* (Dec. 12, 2024),
 https://perma.cc/P49E-CRYU...........................................................44

U.S. Dep't of Transp., Primer for Improved Urban Freight Mobility
and Delivery Operations, Logistics, and Technology Strategies
(last visited Aug. 2, 2024),
https://perma.cc/D4A8-KWS7.........................................................................15

**INTRODUCTION**

More than fifty years ago, the Supreme Court explained that the unconstitutionality of a statute that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" would be so obvious as to "need[] no demonstration." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965). Louisiana enacted precisely that statute, and this Court should affirm the injunction prohibiting its enforcement.

The law at issue grants police officers standardless discretion to prevent the public and the press from approaching near enough to observe and document the way they perform official duties in public. *See* La. Rev. Stat. § 14:109 (hereinafter, the "Act"). Under its plain terms, an officer may (or may not) order anyone who approaches within 25 feet to retreat on pain of arrest and prosecution, for any reason or for no reason. The text has nothing to say about how an officer should make that decision—no nexus to safety, obstruction, or any of the other interests Defendants assert here. As a result, the law's sweep catches countless ordinary citizens engaged in wholly innocent conduct, as well as any number of journalists—including

1

Plaintiffs' reporters—who approach within 25 feet of law enforcement officers every day to gather news on matters of urgent public concern.

The District Court found the Act void for vagueness, both because it fails to "provide fair notice to the public as to what will prompt an order to retreat," ROA.363, and "contains no standards by which officers are to determine whether to issue an order to retreat, therefore providing no limits to arbitrary or discriminatory enforcement," *id.* Defendants dispute neither characterization; instead, they insist the law need offer no such guidance because officers cannot make an arrest until an order is disobeyed. *See* Defs.' Opening Br. at 40–41. But as the Supreme Court held in *City of Chicago v. Morales*, 527 U.S. 41 (1999), that defense is circular: The fact "that the ordinance does not permit an arrest until after a dispersal order has been disobeyed does not provide any guidance to the officer deciding whether such an order should issue," *id.* at 62. Where a statute's text "fails to provide such minimal guidelines," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), the law is "vague on its face" because each application represents an officer's arbitrary lawmaking, *id.* at 361. And as the District

Court rightly held, that standardless sweep likewise reflects a profound failure of narrow tailoring that chills Plaintiffs' reporting in violation of the First Amendment. *See* ROA.346. Through either lens, conditioning the right to gather the news on the "moment-to-moment judgment of the policeman on his beat" violates the Constitution. *Kolender*, 461 U.S. at 360.

Rather than engage the grounds for the District Court's injunction, Defendants peg much of their defense of the Act to the Seventh Circuit's recent ruling in *Nicodemus v. City of South Bend*, which found that a narrower Indiana law was not facially overbroad under the First Amendment because the text of *that* statute only permitted officers to order individuals "to stop approaching," 137 F.4th 654, 662 (7th Cir. 2025) (quoting Ind. Code § 35-44.1-2-14), not "to move *away*," *id.* The plain text of Louisiana's law differs on that point: It authorizes officers to order individuals "to stop approaching *or to retreat*," La. Rev. Stat. § 14:109(A) (emphasis added), creating just the sort of 'floating' buffer Defendants appear to concede is unconstitutional. *Nicodemus* flatly rejected, too, Defendants' principal First Amendment defense: that the Act triggers no

scrutiny at all.  *See* 137 F.4th at 663–64.  And though Defendants take pains

to avoid acknowledging it, *Nicodemus* reserved the questions whether

Indiana's law is unconstitutionally vague, *see id.* at 667 n.9,[1] or

unconstitutional as applied to individuals who approach to document

police activity, *see id.* at 670—the grounds on which the District Court

found Louisiana's broader Act invalid.  Even read as favorably as

Defendants can read it, *Nicodemus* only underlines that other states have

found better-tailored tools to balance public safety and First Amendment

rights.  Louisiana's "force field" is unique and uniquely infirm.  *Id.* at 669.

Because the Act cannot stand on the merits, Defendants urge the

Court to avoid reaching them, arguing that Plaintiffs have no avenue to

challenge a statute that attaches new criminal penalties to First

Amendment activity in which they engage every day.  But Defendants'

grab-bag of jurisdictional objections—the thrust of all of which is that the

---

[1]     Indiana's law remains enjoined as unconstitutionally vague in
separate proceedings brought by many of the same plaintiffs here.  *See
Reporters Comm. for Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931 (S.D.
Ind. 2024), *appeal docketed*, No. 24-2927 (7th Cir. Oct. 25, 2024).

Act "has never been enforced against [Plaintiffs]" by these Defendants,

Defs.' Opening Br. at 11—would describe every pre-enforcement challenge

to an unconstitutional state statute. The precedent of this Court and the

Supreme Court holds that no prior history of enforcement is required

before Plaintiffs challenge a statute that, on its face, already regulates what

they do daily—not for standing, *see Holder v. Humanitarian L. Project*, 561

U.S. 1, 16 (2010), not for ripeness, *see id.*, and not under the doctrine of *Ex

Parte Young*, *see Mi Familia Vota v. Ogg*, 105 F.4th 313, 330 (5th Cir. 2024).

Instead, this Court's case law reflects what common sense would

likewise make clear. Plaintiffs' reporters routinely approach within 25 feet

of officers—and are routinely told to stop approaching or retreat—in

settings where the Act now imposes criminal penalties for disobedience. In

each of those daily encounters, absent the preliminary injunction, only

"unbridled discretion in a government official over whether to permit or

deny expressive activity" would stand between Plaintiffs and loss of their

liberties. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988).

The Constitution does not force Plaintiffs to cross their fingers that

Defendants—who are charged with enforcing the law in those settings and have consistently declined to disavow enforcing the Act against Plaintiffs—will "use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

For the reasons herein, Plaintiffs respectfully urge this Court to affirm the District Court's preliminary injunction.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction over Defendants' appeal under 28 U.S.C.

§ 1292(a)(1), and has jurisdiction over Plaintiffs' cross-appeal of the

dismissal of their facial First Amendment claim because "once an order has

been deemed appealable under § 1292(a)(1), the entire order, not merely

the propriety of injunctive relief, comes within this court's scope of

review," *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 520 n.3 (5th Cir. 2002).

## STATEMENT OF THE ISSUES

1.      Whether the District Court correctly concluded that Plaintiffs—news organizations whose employees routinely approach within 25 feet of peace officers and are routinely told to retreat—have standing to challenge Defendants' enforcement of a statute that criminalizes failure to comply, and that Defendants are otherwise proper parties in that action.

2.      Whether the District Court correctly concluded that Louisiana's 25-foot law, under which an officer may order the public and press to retreat for any reason or no reason under threat of arrest, fails to provide adequate guidance to officers deciding whether such an order should issue.

3.      Whether the District Court correctly concluded that Louisiana's 25-foot law, under which an officer may order the public and press to retreat for any reason or no reason under threat of arrest, fails to provide fair notice of the conduct that will prompt issuance of an order to retreat.

4.      Whether Louisiana's 25-foot law is independently unconstitutional under the First Amendment, either on its face or as applied to Plaintiffs' peaceful, nonobstructive newsgathering in public.

# STATEMENT OF THE CASE

## I.    Plaintiffs' newsgathering brings their journalists within 25 feet of law enforcement officers across Louisiana on a routine basis.

Plaintiffs-Appellees/Cross-Appellants ("Plaintiffs") are Deep South Today, *d/b/a* Verite News ("Verite"), Gannett Co., Inc. ("Gannett"), Gray Local Media, Inc. ("Gray"), Nexstar Media, Inc. ("Nexstar"), Scripps Media, Inc. ("Scripps"), and TEGNA Inc. ("TEGNA")—all organizations that gather and report news in Louisiana, and all of whom employ professional journalists dedicated to that purpose.  *See* ROA.14–16.  Plaintiffs' reporters cover Louisiana law enforcement on an ongoing basis.  *See* ROA.18–20.

At each year's Carnival, for instance, journalists and members of the public from around the state cover the celebration of Mardi Gras from Twelfth Night to Ash Wednesday.  On Lundi Gras and Mardi Gras—in addition to the weekends prior that include permitted and organized celebratory parading on Louisiana's public streets—Plaintiffs' reporters repeatedly come into close contact with peace officers from a range of law enforcement agencies that provide crowd control and direct traffic for the

festivities.  *See, e.g.*, Kenny Kuhn, *WWL Mardi Gras Parade Coverage from New Orleans*, 4WWL (Feb. 13, 2024), https://perma.cc/4W3Z-2VQL.

Plaintiffs' journalists likewise routinely encounter members of the State Police in Baton Rouge when covering press conferences held by the Governor, *see* Ange Toussaint, *Governor Jeff Landry Signs Education Reform Bill*, KATC (June 19, 2024), https://perma.cc/J658-655E, developments at the statehouse, Michael Scheidt, *Louisiana Gov. Jeff Landry Signs Health Care Bills Into Law*, WGNO (June 25, 2024), https://bit.ly/3S9ivmF, and Louisiana State University (LSU) football games where troopers from the Louisiana State Police provide security, Jessica Knox, *Heavy Police Presence Planned for LSU vs. Southern Game*, BRProud (Sept. 8, 2022), https://bit.ly/3LoBm9j.

Civil disturbances also bring Plaintiffs' reporters into close contact with peace officers.  For example, Plaintiffs reported extensively on protests in June 2020, and more recently covered the clearing of an encampment on the campus of Tulane University.  *See, e.g.*, Raeven Poole, *Law Enforcement Agencies Raid Pro-Palestine Protest on Tulane University Campus*, WGNO (May 1, 2024), https://bit.ly/3XYmE0o; *see also* Michelle

Liu, *After Protest Crackdown, Some Students and Faculty Criticize Tulane's Approach to Pro-Palestinian Speech*, Verite News (May 6, 2024), https://perma.cc/Z6ZB-DP82.  That coverage required close proximity to officers and often relied on images or video captured within 25 feet.

A broad range of other assemblies, rallies, and newsworthy public events similarly bring Plaintiffs' reporters near officers on a routine basis—and will continue to do so for the foreseeable future.  And reporting within a 25-foot radius of officers performing official responsibilities is likewise essential in other contexts, including at crime scenes[2] and in interviews or press conferences held by public officials or members of law enforcement.[3]

All told, in the course of their work, individual journalists employed by Plaintiffs may come into close contact with peace officers as often as once a day depending on the news cycle.  Richard Erbach, News Director

---

[2]      *See, e.g.*, Curt Sprang, *Two Dead in Mandeville Following Welfare Check Turned Police Shooting*, WGNO (July 6, 2024), https://bit.ly/4f5TcLS.

[3]      *See, e.g.*, Michael Scheidt & Trinity Velazquez, *Police Chief Puts More Cops on the Street After Baton Rouge Had 28 Shootings in March*, BRProud (Mar. 25, 2024), https://bit.ly/45ztZHB.

for Nexstar station WGNO, estimates that reporters and photojournalists in his newsroom will come "within twenty-five feet of law enforcement officers virtually every day for the foreseeable future." ROA.149; *see also* ROA.152 (declaration of Nicole Waivers, estimating that journalists for TEGNA station 4WWL are "in close contact with officers" covering crime scenes "multiple times a week"). And while Plaintiffs' journalists are "careful not to interfere with anything [peace officers] are doing," their own jobs often require them "to be as close as a few feet" to an officer. ROA.133 (declaration of Jazmin Thibodeaux); *see also* ROA.128.

Based on their professional experience, Plaintiffs' journalists— whether they are taking photographs, recording video, or visually observing newsworthy events so they can report on them accurately— "need to be within a conversational distance" to hear when "a police officer is saying something to someone on a scene," ROA.128 (declaration of Curtis Sprang), or to speak to potential sources, *see* ROA.133. To record audio that can be used in a broadcast, Plaintiffs' journalists estimate needing to be "within five feet." ROA.136 (declaration of Katie Fernelius);

*see also* ROA.147; ROA.133.  At a greater distance, Plaintiffs' reporters are also unable to view details like an officer's badge number or the name on his uniform.  *See* ROA.136; *see also* ROA.147 (estimating that it is difficult to avoid an obstructed view of a typical scene from more than 15 feet away).

## II.     Louisiana adopts the 25-foot law.

On May 24, 2024, the Governor of Louisiana signed into law HB 173, which, in relevant part, makes it a criminal offense to "knowingly or intentionally approach within twenty-five feet of a peace officer who is lawfully engaged in the execution of his official duties after the peace officer has ordered the person to stop approaching or to retreat."  La. Rev. Stat. § 14:109(A).  The Act's definition of "peace officer" encompasses a broad range of agencies, *see id.* § 14:109(B) (cross-referencing La. Rev. Stat. § 14:112.4(B)(2) and La. Rev. Stat. § 40:2402(3)), including troopers of the Louisiana State Police, *see* La. Rev. Stat. § 40:2402(3)(a); La. Rev. Stat. § 40:1379.  The Act's only affirmative defense provides that no liability attaches "if the defendant can establish that the lawful order or command was neither received nor understood by the defendant nor capable of being

received or understood under the conditions and circumstances that existed at the time of the issuance of the order." La. Rev. Stat. § 14:109(C). A violation is punishable by fines and imprisonment. *See id.* § 14:109(D).

The Act took effect on August 1, 2024.

### III.    The 25-foot law's impact on Plaintiffs and their journalism.

Because Plaintiffs' journalists are often asked by officers to stop approaching or retreat while gathering the news—requests which, until August 1, were voluntary—they were required to adjust their behavior immediately to avoid the risk of arrest. WGNO's Erbach, for instance, estimated before the Act was passed "that a member of the WGNO newsroom is . . . asked to step back or move away from an officer around once a week." ROA.149. And in Plaintiffs' reporters' experience, officers often make such requests even where there is no risk of interference and no other law would apply. While Plaintiffs' journalists would previously stand on their rights if an officer issued a direction without authority, *see* ROA.141–43, they would now comply to avoid arrest, ROA.143.

Before the District Court enjoined Defendants' enforcement of the Act, Plaintiffs' reporters were also required to adjust the way they gather news out of concern they would be unable to comply with HB 173 in practice. In newsroom discussions about the Act, Plaintiffs' journalists attempted—and struggled—to accurately estimate how far 25 feet is, *see* ROA.154; ROA.149; ROA.143; ROA.136–37, and would not be able to reliably do so in the field, *see* ROA.143; ROA.136–37; ROA.134.

Plaintiffs' newsroom directors also struggled to provide guidance on how to comply with the Act when physical conditions would make doing so impossible, as in "a crowded situation like a parade" with multiple officers. ROA.154–55 (declaration of Nicole Waivers). For instance, Katie Fernelius, a reporter for Verite News, regularly covers events in the French Quarter, *see* ROA.139, but "streets in the interior of the French Quarter are 22 feet wide," U.S. Dep't of Transp., Primer for Improved Urban Freight Mobility and Delivery Operations, Logistics, and Technology Strategies (last visited Aug. 2, 2024), https://perma.cc/D4A8-KWS7.

In each situation, Plaintiffs' journalists would be put to the choice between complying—losing their chance to gather information—or facing arrest. ROA.139. Curtis Sprang of WGNO brought up an expression he has "heard often in Louisiana" that "[y]ou might beat the charge, but you won't beat the ride." ROA.131. In other words, "[e]ven if criminal charges wouldn't stand up [in court]," disobeying means you "risk enduring the process of being handcuffed, transported in the back of a police car, and waiting in jail for hours." *Id.* Sprang said he does "not want to be in that situation just for doing [his] job, so [he] would comply with an officer's request to move even though [he is] not interfering with or obstructing officers, even if it means that [he] cannot gather the news." *Id.*

In response, Plaintiffs' newsroom directors have advised their journalists to err on the side of caution and comply with any requests to retreat after the Act's passage, even where they are not interfering and retreating comes at the cost of exercising their First Amendment rights. *See* ROA.147; ROA.154–55. In the words of KATC Senior Reporter Jazmin Thibodeaux, "Without HB 173, I would insist on my rights to gather news

and record in public places in response to a request by a law enforcement officer that was unreasonable under the circumstances." ROA.134. "With HB 173, I would comply to the best of my ability and stay a long distance away" because "I do not want to be arrested for doing my job." *Id.*

## IV.   Plaintiffs' lawsuit and the District Court's injunction.

On July 31, 2024, Plaintiffs filed this action in the U.S. District Court for the Middle District of Louisiana against Louisiana Attorney General Liz Murrill, Superintendent of Louisiana State Police Robert P. Hodges, and District Attorney of East Baton Rouge Parish Hillar C. Moore, III, challenging the Act's constitutionality. *See* ROA.11. Plaintiffs alleged that the Act is void for vagueness under the Due Process Clause and that it violates the First Amendment, both on its face and as applied to Plaintiffs' peaceful, nonobstructive newsgathering in public. *See* ROA.24–28.

On September 13, 2024, Plaintiffs moved for a preliminary injunction restraining Defendants from enforcing the Act against them. ROA.89–125. Defendants opposed that motion and moved to dismiss. ROA.173–209.

On January 31, 2025, the District Court issued the decision under review, denying Defendants' motion to dismiss as to Plaintiffs' vagueness and as-applied First Amendment claims, granting Defendants' motion to dismiss Plaintiffs' facial First Amendment claim, and granting Plaintiffs' motion for a preliminary injunction. *See* ROA.366–67. As to ripeness, the District Court found that "Plaintiffs have alleged that their journalists are in regular contact with law enforcement and routinely receive orders to back away," and that the "threat of having the Act enforced against them is present and looming over Plaintiffs and their journalists." ROA.315. Analyzing each claim separately, the District Court found that Plaintiffs had standing for each, having established both an "imminent" threat of enforcement and a present chilling effect on their rights. ROA.321–27.

The District Court rejected Defendants' arguments that Plaintiffs' injuries are not traceable to Defendants and that Defendants Murrill and Hodges are not proper parties. As to traceability, the District Court pointed out that "Colonel Hodges and the State Police have the authority to issue an order under the Act" in the circumstances where Plaintiffs

established they frequently encounter State Police Troopers within 25 feet, "potentially violating Plaintiffs' First Amendment rights," and that "AG Murrill and DA Moore have the authority to prosecute offenders of the Act" under those same circumstances. ROA.323. Neither Murrill nor Hodges are entitled to sovereign immunity, the District Court found, because the *Ex Parte Young* exception applies. *See* ROA.332–35.

On the merits, the District Court found that Plaintiffs were likely to succeed in demonstrating that the Act is void for vagueness because "the Act does not provide fair notice to the public as to what will prompt an order to retreat and thus the public is not on notice of what behavior to avoid," ROA.363 (citing *Morales*, 527 U.S. at 58–59 (plurality opinion)), and because it "contains no standards by which officers are to determine whether to issue an order to retreat, therefore providing no limits to arbitrary or discriminatory enforcement," *id.* (citing *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974)). As the District Court explained, neither "the requirement that a citizen know they are within 25 feet" nor "the 25-foot

limit itself" saved the Act, because those requirements do nothing "to eliminate the discretion to *issue* the order to retreat."  ROA.357–58.

On the First Amendment questions presented, the District Court found that Plaintiffs stated a successful as-applied First Amendment claim. *See* ROA.346.  The District Court recognized that the Act triggered First Amendment scrutiny as applied to Plaintiffs' "proposed course of conduct, peaceful and unobstructive newsgathering."  ROA.342.  Applying intermediate scrutiny, the District Court found that the Act is not narrowly tailored, emphasizing that "[e]xamples of how the Act could be less restrictive while still achieving the governmental interests abound" because the Act's text did not link its scope to interference, attempted interference, or any of the other interests that Defendants cited to justify it. ROA.345.  The District Court further concluded that the Act was inadequately tailored because Plaintiffs had adequately alleged that "the government interests could be achieved by a smaller buffer zone" that would leave open adequate alternative channels for newsgathering.  *Id.*

As to Plaintiffs' facial First Amendment claim, the District Court granted Defendants' motion to dismiss with leave to amend; despite having found the Act would not pass intermediate scrutiny, the District Court concluded that Plaintiffs had not pleaded with sufficient specificity the applications of the Act that would be unconstitutional and expressed uncertainty whether the Supreme Court's cases forbidding "unbridled discretion" applied outside the permitting context.  ROA.348–52.

Concluding that Plaintiffs were likely to succeed on the merits of their vagueness claim, in particular, and that the equities favored Plaintiffs, ROA.362–66, the District Court issued a preliminary injunction restraining Defendants from enforcing the Act, *see* ROA.367.  On March 3, 2025, Defendants appealed.  ROA.368.  On March 17, Plaintiffs cross-appealed from the dismissal of their facial First Amendment claim.  ROA.370.

## STANDARD OF REVIEW

This Court reviews the grant of a "preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (citation omitted).

## SUMMARY OF ARGUMENT

Whether the lens is the Fourteenth Amendment or the First, the Act violates the Constitution for much the same reason. Defendants never dispute that the Act affords an officer unbounded discretion to choose which of the countless individuals who pass within 25 feet should be ordered to retreat, on pain of arrest and prosecution. The text has nothing to say about that decision—no "guidance to the officer deciding whether such an order should issue," *Morales*, 527 U.S. at 62 (majority opinion), no nexus to safety, interference, or any of the other interests Defendants assert.

Instead, an officer can just as well issue an order because the moon is high, the tides are low, or because "he had a bad breakfast." Recording of Oral Arg. at 30:02, *Reporters Comm. for Freedom of the Press v. Rokita*, No. 24-2927 (7th Cir. May 13, 2025), https://perma.cc/T4TS-ZX7M (Easterbrook, J.) (describing Indiana's buffer statute in a pending vagueness challenge). And where a statute's text "fails to provide such minimal guidelines," *Kolender*, 461 U.S. at 358, the law is "vague on its face" because every application represents an officer's arbitrary lawmaking, *id.* at 361.

In authorizing officers "to decide arbitrarily which members of the public they will order to disperse," Louisiana has adopted a statute "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*." *Morales*, 527 U.S. at 58–59 (plurality opinion). And despite Defendants' best effort to muddy those waters with a bevy of jurisdictional arguments—arguments difficult to understand as anything but a categorical objection to pre-enforcement challenges generally—the District Court's jurisdiction was clear. The Act attaches new penalties to First Amendment activities in which Plaintiffs engage every day, and Defendants, who have repeatedly declined to disavow enforcing it against Plaintiffs, are charged by Louisiana law with enforcing it in the settings where Plaintiffs' journalists routinely encounter peace officers. The District Court rightly enjoined the Act's enforcement. This Court should affirm.

## ARGUMENT

## I.    The District Court rightly exercised jurisdiction.

Defendants raise a laundry-list of objections to the District Court's jurisdiction, the thrust of all of which is that the Act "has never been enforced against Plaintiffs" by these Defendants.  Defs.' Opening Br. at 13. That bill fits, by definition, every pre-enforcement challenge to a statute's constitutionality.  *But see Humanitarian L. Project*, 561 U.S. at 16 (finding standing to bring "as-applied preenforcement challenge," including on vagueness grounds, to statute that had never been enforced against plaintiffs); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (finding standing to bring "pre-enforcement facial challenge" to statute not yet in effect); *Roake v. Brumley*, No. 24-30706, 2025 WL 1719978, at *11 (5th Cir. June 20, 2025) (finding *Ex Parte Young* exception satisfied in challenge to statute not in effect).  The District Court rightly exercised jurisdiction.

### A.    Plaintiffs have standing to challenge the Act.

The record evidence in this case established that Plaintiffs' reporters are routinely within 25 feet of officers and are routinely instructed to

retreat, *see* ROA.149; *see also* ROA.152, instructions now backed by the

threat of criminal penalties that force Plaintiffs "to choose between

refraining from core political speech on the one hand" and risking arrest on

the other, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014). Every

court to address the issue has found that similar, even identical facts

demonstrate a credible threat of enforcement sufficient to show standing.

*See Nicodemus*, 137 F.4th at 662 n.6 (plaintiff who had previously been told

to move back, but never arrested, had standing to challenge Indiana's

narrower law); *see also Reporters Comm.*, 751 F. Supp. 3d at 939–40 (finding

that several of the same plaintiffs here had standing to bring the same

claims against Indiana's law). None of the chaff that Defendants toss up

undermines that common-sense conclusion for any of Plaintiffs' claims.

    1. <u>Plaintiffs have standing to bring a vagueness claim.</u>

For purposes of vagueness, Defendants insist that "a plaintiff who

has 'never been arrested or prosecuted for violating' a criminal statute

'lack[s] standing to preemptively challenge [it] under the Due Process

Clause"—in other words, Defendants take the remarkable position that

there are no pre-enforcement challenges in the vagueness context.  Defs.'

Opening Br. at 19 (quoting *Nat'l Press Photographers Ass'n v. McCraw*, 90

F.4th 770, 782 (5th Cir. 2024) (hereinafter "*Press Photographers*")).  *Press*

*Photographers* says no such thing, since that rule would flatly violate

Supreme Court precedent.  *See Humanitarian L. Project*, 561 U.S. at 15–18

(finding pre-enforcement vagueness challenge "suitable for judicial

review," *id.* at 16, and reiterating that plaintiffs "should not be required to

await and undergo a criminal prosecution," *id.* at 15 (citation omitted)).

In *Press Photographers*, plaintiffs could not demonstrate standing on

their vagueness claim because they provided no evidence that the

challenged law had been enforced against them "*or anybody else*," 90 F.4th

at 782 (emphasis added), even though the law they challenged had been

enacted "a decade ago," *id.* at 777.  In other words, applying the ordinary

inquiry whether a plaintiff faces a "credible threat" of enforcement, *id.* at

782, the statute was moribund.  That rationale does Defendants no good in

connection with a newly enacted law.  Here, Plaintiffs have demonstrated

that their First Amendment activity routinely drew instructions to retreat

prior to the Act's adoption in scenarios where the statute now criminalizes noncompliance, *see* ROA.147–49; ROA.154, establishing that the threat of enforcement is credible, *see Reporters Comm.*, 751 F. Supp. 3d at 939–40.[4]

Defendants' argument suffers from the further difficulty that *Press Photographers* recognized that "vagueness may be grounds for a pre-enforcement challenge insofar as it chills protected speech under the First Amendment," *Press Photographers*, 90 F.4th at 782 n.32. Here, Plaintiffs submitted extensive evidence that the Act's passage forced them to immediately alter their newsgathering to avoid the risk of arrest—obeying

---

[4] Defendants repeatedly assert that no officer in the state has ever ordered any person to stop approaching or retreat under the Act. *See* Defs.' Opening Br. at 2, 19, 27. Setting aside the clash between that claim and their representation that the Act is vital to officers' safety, the argument rests on a sleight of hand. Throughout the lifetime of a case, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed,*" *Gen. Land Office v. Biden*, 71 F.4th 264, 272 n.12 (5th Cir. 2023) (emphasis added) (citation omitted), and Plaintiffs' declarations therefore describe the facts as they existed at that time. If Defendants believe that every officer in the state reached a tacit agreement not to enforce the Act after the filing of the complaint, that would be a mootness argument, not a standing issue—one they bear the "heavy burden" of substantiating. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 170 (2000) (citation omitted).

instructions to retreat that they would previously have contested, and avoiding situations where compliance with an order to retreat would be impossible because they cannot know when or whether an officer in his sole discretion will issue one, *see* ROA.153; ROA.139; ROA.149.

In response, Defendants insist that chilling effect does not suffice for standing because they believe Plaintiffs will not prevail in demonstrating that the Act implicates the First Amendment on the merits. *See* Defs.' Opening Br. at 21. Setting aside the fact that the District Court found "the First Amendment *is* implicated by the Act," ROA.343 (emphasis added)— as the Seventh Circuit likewise found in reviewing Indiana's narrower law, *see Nicodemus,* 137 F.4th at 663–64—the standing analysis "assume[s]" Plaintiffs are "correct on the merits," *Press Photographers*, 90 F.4th at 783 n.39 (citation omitted). In that respect, Defendants again run headlong into *Humanitarian Law Project*, which found a pre-enforcement vagueness challenge suitable for judicial review even though the law had never been enforced against the plaintiffs, even though that law was "directed at conduct" on its face, 561 U.S. at 28, and even though those plaintiffs' claims

ultimately faltered on the merits.  Nothing in *Press Photographers*, then, supports Defendants' effort to avoid justifying the Act's vagueness.

### 2. Plaintiffs have standing to bring First Amendment claims.

The District Court was likewise correct to find that Plaintiffs had standing as to their First Amendment challenges to the Act, both on its face and as-applied.  "It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech."  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020), *as revised* (Oct. 30, 2020).  In this posture, "chilling of speech because of the mere existence of an allegedly vague or overbroad statute can be sufficient injury to support standing," *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006), even if "a plaintiff does not intend to violate a policy," *Speech First*, 979 F.3d at 332 n.10, so long as they *do* intend "to engage in a course of conduct arguably affected with a constitutional interest" and "arguably proscribed" by the statute, *id.* at 330 (citation and alteration omitted).  And "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund)

statutes that facially restrict expressive activity by the class to which the

plaintiff belongs, courts will assume a credible threat of prosecution in the

absence of compelling contrary evidence." *Id.* at 335 (citation omitted).

Defendants dispute none of those standards. Instead, they insist

Plaintiffs lack standing because the law does not reference "newsgathering,

videoing, recording, broadcasting, reporting, or livestreaming." Defs.'

Opening Br. at 24. But the course of conduct that Plaintiffs engage in—and

which the Act authorizes officers to proscribe—is "*approaching* the scene of

newsworthy events," ROA.23 (emphasis added), and "engag[ing] in

peaceful, nonobstructive newsgathering *within 25 feet of law enforcement*

*officers*," ROA.25 (emphasis added). Defendants could not dispute that the

Act regulates *that* activity. And that activity is more than arguably affected

with a constitutional interest, because the First Amendment protects not

just documenting an event but also "approaching" it "to carry out

plaintiffs' protected monitoring and recording." *Brown v. Kemp*, 86 F.4th

745, 779 (7th Cir. 2023); *see Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir.

2023) ("[S]ince the First Amendment protects the right to criticize police,

then a fortiori it protects the right to remain in the area to be able to criticize the observable police conduct.").  For just that reason, the Seventh Circuit in *Nicodemus* concluded that even Indiana's narrower buffer law triggered First Amendment scrutiny on its face.  137 F.4th at 663–64.

The analysis for Plaintiffs' as-applied claim differs little, despite Defendants' added insistence that a "developed factual record" of a particular enforcement action is necessary to adjudicate an as-applied pre-enforcement challenge.  Defs.' Opening Br. at 24 (quoting *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014)).  Their "near talismanic mantra that 'further factual development' would 'significantly advance' this court's ability to resolve plaintiffs' claims would be more compelling if [defendants] gave an example of factual development that would be helpful to the court," *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 931 (5th Cir. 2023), but in the course of extensive briefing Defendants never have.

The Supreme Court, for its part, has repeatedly found that "as-applied preenforcement challenge[s] brought under the First Amendment" are "suitable for judicial review" even where a statute has never previously

been enforced against the plaintiff. *Humanitarian L. Project*, 561 U.S. at 16. The record in the proceeding need only be sufficient to determine whether, "as applied to plaintiffs[,] the conduct triggering coverage under the statute" implicates the First Amendment, *id.* at 28, and, next, whether the statute satisfies the relevant degree of constitutional scrutiny. To the extent Defendants would like a richer record *supporting* their assertion that the Act passes muster, it was their burden to develop one. *See Siders v. City of Brandon*, 123 F.4th 293, 301 (5th Cir. 2024) (even in a preliminary-injunction posture, the state bears the burden of justifying restrictions on speech).

Nothing in *Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014), on which Defendants principally rely, suggests otherwise. Set aside the fact that *Justice* expressly reiterated that "actual arrest or prosecution" is unnecessary to demonstrate standing on a chilling-effect theory. *Id.* at 291–92 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). There, a group of plaintiffs challenged a $200 cap on political donations but refused to say how much they wanted to spend; in fact, the record on that question was not just "scant" but internally "inconsistent." *Id.* at 293. As a result, the

court could not know whether an injunction on the plaintiffs' as-applied

claim should allow them to spend $300, $500, $800, or some other amount,

and could not in turn determine whether prohibiting expenditures in that

unknown amount would violate the First Amendment. *See id.* at 294.

Here, though, Defendants have identified no "uncertainty" in the

Complaint's description of Plaintiffs' proposed course of conduct, *id.* at

294, that would make an as-applied remedy difficult to fashion. On the

contrary, such an order writes itself: An injunction on Plaintiffs' as-applied

claim would prohibit the Defendants from enforcing the Act against

Plaintiffs for "peaceful, nonobstructive newsgathering within 25 feet of law

enforcement officers performing their duties in public spaces," ROA.25, but

would preserve Defendants' ability to enforce the Act for "behavior that

obstructs or interferes with effective law enforcement or the protection of

public safety," *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir.

2012) (ordering entry of injunction adopting that distinction for as-applied

pre-enforcement newsgathering claim). And other circuits have flatly

rejected the suggestion that any further factual development is necessary or

helpful on that footing.  *See id.* at 593–94 (that a plaintiff "does not know precisely when it or its employees would face prosecution or which officers would be involved" does not undermine standing where, "absent officer consent," the law on its face would prohibit plaintiff's proposed activities).

To return to brass tacks:  Louisiana has attached new criminal penalties to First Amendment activity that Plaintiffs' reporters engage in every day.  The result is both a credible threat that the Act will be enforced against them, *see Speech First*, 979 F.3d at 330, and a present chilling effect because Plaintiffs were immediately "forced to modify [their] behavior in order to avoid future adverse consequences," *Braidwood Mgmt.*, 70 F.4th at 929 n.27 (citation and alterations omitted).  The District Court was more than equipped to "see the potential harms, adjudicate on the facts presented, and grant any appropriate concrete relief."  *Id.* at 930.

B.     <u>Plaintiffs' claims are ripe.</u>

Defendants recapitulate the same arguments as a ripeness objection. "It remains unclear whether [this Court] can reject a claim as unripe once plaintiffs have established Article III standing," *Braidwood Mgmt.*, 70 F.4th

at 930 n.28, and this is hardly a natural case to break ground on the issue.

Start with the hardship of denying Plaintiffs prompt review—a question

that largely duplicates the injury inquiry for purposes of Article III

standing. *See Susan B. Anthony List*, 573 U.S. at 157 n.5. Defendants are

remarkably candid that their preferred vehicle for resolving Plaintiffs'

claims would require Plaintiffs to first suffer an arrest, the quintessential

hardship that pre-enforcement challenges are intended to avoid. But this

Court and the Supreme Court could hardly have said more clearly that a

plaintiff need not "bet the farm" or risk being "arrested in connection with

violating [a] statute" that, by its terms, already regulates what they want to

do—even when the statute has "never been applied" to them (or anyone).

*Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018) (citation omitted).

The second prong of the ripeness inquiry—whether further factual

development would be necessary—is likewise straightforward. Here,

Plaintiffs' claims present "pure question[s] of law." *Braidwood Mgmt.*, 70

F.4th at 930. "At least in a pre-enforcement posture," for instance, a claim

that a law is void for vagueness because it contains no enforcement

standard "is by its nature facial," *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017), because the plain text either does or does not contain "minimal guidelines to govern law enforcement," *Morales*, 527 U.S. at 60 (majority opinion) (citation omitted). In other words, "[t]he ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case." *Id.* at 71 (Breyer, J., concurring in part and concurring in the judgment).

Misunderstanding that point, Defendants rely throughout on case law disfavoring facial challenges where a statute's vagueness stems from *linguistic* ambiguity. But the Supreme Court has always distinguished cases of unclear standards, where the text "appl[ies] without question to certain activities, but [its] application to other behavior is uncertain," from laws that fail to provide "any ascertainable standard" in the first place. *Goguen*, 415 U.S. at 578. The latter may be 'clear' in a colloquial sense—a law reading 'do what any police officer tells you to do' is not linguistically

ambiguous—but they are vague on their face for purposes of due process, because the lack of a guiding standard "affects all who are prosecuted," *id.*

Here too, no further factual development would clarify the question whether the text provides "guidance to the officer deciding whether such an order should issue." *Morales*, 527 U.S. at 62 (majority opinion). On the contrary, the Supreme Court has made clear that "an immediate facial attack on the law" is favored, not discouraged, where such arbitrary discretion is at issue, *City of Lakewood*, 486 U.S. at 759, because the "[s]elf-censorship" threatened by unguided discretion "is immune to an 'as applied' challenge," *id.* at 757; *see also Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940) (same with respect to a vague criminal statute in particular).

The same is true of Plaintiffs' First Amendment claims. "On a facial challenge" under the First Amendment, this Court "do[es] not look beyond the text," so further factual development would be pointless. *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019). And measuring HB 173's constitutionality against a proposed course of conduct for Plaintiffs' as-applied claim—asking, in other words, "is there a legally sufficient basis

for [Defendants] to place a burden on [P]laintiffs' First Amendment rights?"—likewise "presents a legal question" that needs no further development for the reasons already discussed above. *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 663 (E.D. La. 2017). Plaintiffs' challenges to the Act's constitutionality are ripe; Defendants' insistence that Plaintiffs' reporters first report to jail before obtaining judicial review is meritless.

C.     All Defendants are proper parties.

Recasting the same arguments in another mold, Defendants argue they are the wrong parties to defend the Act, either because they are not to blame for its chilling burdens or because Defendants Murrill and Hodges— but not Defendant Moore[5]—are immune from suit. Defendants are wrong.

As to traceability, the suggestion that the Complaint did not link Plaintiffs' injury to these particular Defendants is difficult to understand. *See* ROA.16–17. Throughout the Complaint and their reporters' declarations, Plaintiffs described situations in which they approach within

---

[5]     *See Hudson v. City of New Orleans*, 174 F.3d 677, 679 (5th Cir. 1999) (finding Louisiana district attorney not entitled to sovereign immunity).

25 feet of peace officers, including where Defendants Murrill and Moore would be the prosecuting authorities—all of which are circumstances in which the Act now puts Plaintiffs to an unconstitutional choice between risking arrest or prosecution *by these Defendants* or refraining from exercising their rights. *See, e.g.*, ROA.18–19; ROA.152–53; ROA.138; ROA.146. It should be obvious traceability and redressability are satisfied where challengers to a criminal statute sue "those who would arrest them" for their proposed activities and the officials "charged with prosecuting individuals who violate criminal laws." *Press Photographers*, 90 F.4th at 785.

Defendants' categorical objection to pre-enforcement challenges fares no better as a case for immunity for Defendants Murrill and Hodges. This Court has held again and again that "[a] history of prior enforcement is not required" to invoke the *Ex Parte Young* exception to sovereign immunity, "especially in the pre-enforcement context that applies here." *Mi Familia Vota*, 105 F.4th at 330; *see also Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023) ("actual threat of or imminent enforcement is not required" to satisfy *Ex Parte Young* (citation and internal quotation marks omitted)); *Roake*, 2025

WL 1719978, at *11 (*Ex Parte Young* exception satisfied in challenge to statute not yet in effect).  Plaintiffs need only show that Murrill and Hodges have a "particular duty to enforce the statute in question," *Mi Familia Vota*, 105 F.4th at 325 (citation omitted); "some scintilla" of willingness to do so, *id.* at 329 (citation omitted); and the power to enforce the Act through "compulsion or constraint," *Press Photographers*, 90 F.4th at 786 (citation omitted).  All three requirements are satisfied here.

Defendant Hodges and the State Police, for their part, have a specific statutory "dut[y]" to "enforce the criminal and traffic laws of the state." La. Rev. Stat. § 40:1379(A).  That includes the Act, and this Court has already held that parallel "heads of Texas law-enforcement agencies" are proper parties in a challenge like this one because "they are *directly* responsible for enforcing Texas's criminal laws."  *Press Photographers*, 90 F.4th at 786.  What's more, Defendant Hodges is responsible for enforcing "the particular statutory provision that is the subject of the litigation," *Mi Familia Vota*, 105 F.4th at 327 (citation omitted), because the Act defines him and other members of State Police as "peace officers" authorized to issue

orders, La. Rev. Stat. § 14:109(B); *id*. § 40:2402(3).  Defendant Hodges has

shown willingness to enforce the Act, too, refusing to disavow its

enforcement against Plaintiffs and insisting on its importance to officers'

safety.  *See* ROA.334; *compare Mi Familia Vota*, 105 F.4th at 331 (no

willingness to enforce where defendant represented "they will not enforce

a challenged statute while litigation over its constitutionality is ongoing").

Defendants insist they should not have to say they are *un*willing to enforce

the Act against Plaintiffs, but it is difficult to see what other evidence of

willingness they think could exist in a challenge to a newly enacted law—

where this Court has said with crystal clarity that "[a] history of prior

enforcement is not required" to invoke *Ex Parte Young*.  *Mi Familia Vota*, 105

F.4th at 330.  The fact that state troopers "arrest people for violating

[Louisiana] law," finally, satisfies the requirement that Hodges "exercis[e]

compulsion or constraint in service of the law."  *Press Photographers*, 90

F.4th at 786 (citation and internal quotation marks omitted).

     Defendant Murrill likewise cannot retreat behind sovereign

immunity.  Defendants insist she has no duty to enforce the Act because

"the Attorney General only has the authority to advise and assist in the prosecution of a criminal case upon request of a district attorney," Defs.' Opening Br. at 32 (quoting *White Hat v. Landry*, 475 F. Supp. 3d 532, 549 (M.D. La. 2020)), but that is exactly what has already happened in New Orleans:  Defendant Murrill has entered into a cooperative agreement with the Orleans Parish District Attorney that formally invokes Article IV, Section 8 of the Louisiana Constitution to request that the Attorney General step into the District Attorney's shoes for any cases involving Louisiana State Police.  *See* Louisiana Attorney General's Office and Orleans Parish District Attorney's Office Cooperative Endeavor Agreement at 1 (Feb. 5, 2024), https://perma.cc/7E2Z-W4QP.  That agreement creates not just a power but a duty; in it, Defendant Murrill specifically "agrees to [] prosecute any and all criminal matters that stem from an investigation or arrest made by (or with the assistance of) the Louisiana State Police . . . in the Parish of Orleans."  *Id.* at 2.  And the same language makes clear that Defendant Murrill—who, like Defendant Hodges, refuses to disavow

enforcing the Act against Plaintiffs—has demonstrated a willingness to

enforce it when State Police make arrests under it in New Orleans.

Indeed, as the District Court underlined, Defendant Murrill has made

repeated public statements about the importance of the Act, including for

use against individuals "interfering with the police doing their job because

they're trying to film them."  Talk 107.3, *Mornings with Brian Haldane: Liz

Murrill*, at 1:30 (Dec. 12, 2024), https://perma.cc/P49E-CRYU; ROA.334

(citing *id.*).  She cannot avoid responsibility for her role in enforcing the

statute, and it is straightforward to identify the "specific actions" of hers

"that this Court can enjoin" to prevent a violation of the Constitution, *Book

People, Inc.*, 91 F.4th at 335: enforcement of the Act against Plaintiffs for

gathering the news within 25 feet of State Police in New Orleans.

## II.     The Act is void for vagueness under the Due Process Clause.

The District Court concluded that Plaintiffs are likely to succeed on

their void-for-vagueness claim on either of two independent grounds: (1)

because the Act "contains no standards by which officers are to determine

whether to issue an order to retreat, therefore providing no limits to

arbitrary or discriminatory enforcement," ROA.363, and (2) because it fails to "provide fair notice to the public as to what will prompt an order to retreat and thus the public is not on notice of what behavior to avoid," *id.* Either holding justifies affirming the District Court's injunction.

A. The Act affords arbitrary discretion to law enforcement officers to decide which of the countless individuals who approach within 25 feet should be ordered to retreat.

A criminal statute is void for vagueness if the law is "so standardless that it invites arbitrary enforcement," *Johnson v. United States*, 576 U.S. 591, 595 (2015), a defect that invalidates the statute "on its face," *Kolender*, 461 U.S. at 361, because every application "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat," *id.* at 360 (citation and alterations omitted). The Act is such a statute, "indistinguishable from the law [the Supreme Court] held invalid in *Shuttlesworth v. Birmingham*" because it permits officers "to decide arbitrarily which members of the public they will order to disperse." *Morales*, 527 U.S. at 58–59 (plurality opinion). Or to approach the question from the opposite direction, if a dispersal-order statute like the Act does not "limit dispersal authority to

situations in which dispersal is *necessary* to ensure [public] safety and order," it "permits law enforcement too much discretion" in violation of the Due Process Clause.  *Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012).

In the teeth of *Morales* and *Shuttlesworth*, Defendants insist officers' discretion is not "absolute" because officers may only arrest someone who approaches *after* they have made the (arbitrary) decision to issue an order.  Defs.' Opening Br. at 40–41.  But on that question, the Supreme Court's decision in *Morales* is directly on point—and Defendants' repeated reliance on the dissent in that case gives the game away that *Morales* dooms the Act.  *See id.* at 41, 43 (citing *Morales*, 527 U.S. at 83, 85 (Scalia, J., dissenting)).  There, the Court dealt with a dispersal-order ordinance that permitted officers to issue orders where two or more persons—including at least one whom officers reasonably believed to be a gang member—were seen "remain[ing] in any one place with no apparent purpose."  *Morales*, 527 U.S. at 47–48 (majority opinion) (citation omitted).  Chicago argued the law in fact contained three objective limits:  It did not "apply to people who are moving," *id.* at 61 (majority opinion), it did "not permit an arrest if

individuals obey a dispersal order," *id.*, and it did not apply "unless the officer reasonably believes that one of the loiterers is a member of a criminal street gang," *id.* But the Court found each purported limitation "insufficient" on grounds that likewise make clear the Act is void. *Id.*

The second of Chicago's failed arguments (that the order requirement itself limits officers' discretion) is identical to Defendants' defense of the Act. And *Morales* held that Defendants' logic is circular: The Act "does not provide any guidance to the officer deciding whether such an order should issue" in the first place. 527 U.S. at 62 (majority opinion). Where a statute fails to explain when an officer should order individuals to retreat, "the move-on provision could not cure—and might well compound—its enforcement-discretion defect." *Agnew v. Gov't of District of Columbia*, 920 F.3d 49, 60 (D.C. Cir. 2019). In other words, due process requires that the Act "curtail[] law enforcement's dispersal authority," not just the power to make arrests if an (arbitrary) order is disobeyed. *Bell*, 697 F.3d at 463.

For much the same reason, Defendants' repeated references to *mens rea*—by which they mean the fact that the statute requires 'knowing' failure

to comply with a retreat order, not an intent to cause some proscribable harm—get them nowhere. If officers enjoy arbitrary discretion to issue the order in the first place, "[a] person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability." *Agnew*, 920 F.3d at 60; *see also Goguen*, 415 U.S. at 580 (an intent requirement does not cure vagueness if the conduct element continues to lack an enforcement standard). After all, Defendants' defense would just as well fit the statutes in *Shuttlesworth*—neither of which permitted an arrest until an order was disobeyed—despite the Court's plain statement that both "evoke[d] constitutional doubts of the utmost gravity." *Shuttlesworth*, 382 U.S. at 91–93.

*Morales* likewise makes clear why Defendants' reliance on the observation that the Act applies only within 25 feet does nothing to supply the missing enforcement standard. True enough, an officer does not have latitude to issue an order to someone 26 feet away—but just as Chicago's insistence that officers could not issue orders to people who were moving "[did] not even address the question of how much discretion the police

enjoy in deciding which stationary persons to disperse," the Act's arbitrary

25-foot bubble still grants officers standardless discretion within that

bubble. *Morales*, 527 U.S. at 61–62 (majority opinion). The question asked

by the vagueness inquiry is not whether the statute contains *any*

boundaries—a law that read 'do what any police officer tells you to do'

would not be less vague if it applied only on Tuesdays—but whether those

limits guide officers in distinguishing "innocent conduct," *id.* at 60, from

conduct with the "harmful purpose or effect" the legislature intended to

address, *id.* at 62. None of the limits Defendants point to provide that

guidance, because the Act's sweep is defined entirely in terms of "harmless

conduct"—an order can issue to anyone who passes within 25 feet, period,

regardless whether their presence implicates any state interest. *Id.* at 63.

For much the same reason, it makes no sense for Defendants to

maintain that the Act does not call for "an officer's subjective judgment"

because the Act, in lieu of a poorly articulated enforcement standard, has

no standard at all. Defs.' Opening Br. at 40. That brings this case even

closer to *Shuttlesworth*. There is nothing subjective about whether a person

is "stand[ing] on a public sidewalk," *Shuttlesworth*, 382 U.S. at 90, but a law that authorizes police to disperse *anyone* standing on a public sidewalk extends extraordinary enforcement discretion to law enforcement—so much so that its unconstitutionality "needs no demonstration," *id.* Here too, an officer must make the (subjective) decision whether some, all, or none of the vast number of individuals who pass within 25 feet should be ordered to retreat, and the statute provides no guidelines—not even "minimal guidelines," *Kolender*, 461 U.S. at 358—for making that call.

To escape the force of *Shuttlesworth* and *Morales*, Defendants tie themselves to the Seventh Circuit's decision in *Nicodemus*. But that opinion "do[es] not consider . . . whether [Indiana's] buffer law is unconstitutionally vague" because the plaintiff in that case "explicitly disavowed" such a challenge, 137 F.4th at 667 n.9; *see also id.* at 667 n.10 (declining to consider whether Indiana's law "cede[s] too much arbitrary decision-making power to government officials"). On the contrary, Indiana's narrower law remains enjoined as unconstitutionally vague, an issue still pending before the Seventh Circuit. *See Reporters Comm. for*

*Freedom of the Press v. Rokita*, 751 F. Supp. 3d 931 (S.D. Ind. 2024), *appeal docketed*, No. 24-2927 (7th Cir. Oct. 25, 2024).  And while Louisiana is wrong to suggest its Act does not create the "roving force field" *Nicodemus* construed Indiana's to avoid, Defs.' Opening Br. at 42, that point—relevant to how much *speech* the Act burdens—is nonresponsive to the due process inquiry, which is why *Nicodemus* did not purport to resolve any vagueness questions.  Whether officers may order individuals "to stop approaching or to retreat," as in Louisiana, La. Rev. Stat. § 14:109(A), or only "to stop approaching," as in Indiana, Ind. Code § 35-44.1-2-14, due process requires "guidance to the officer deciding whether such an order should issue." *Morales*, 527 U.S. at 62 (majority opinion).  The Act never offers any.

As a final fallback, Defendants argue for the first time on appeal that *Morales* was silently overruled in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 237–39 (2022), on the theory that *Morales* is a substantive due process decision in disguise, *see* Defs.' Opening Br. at 43–44 (citing *Morales*, 527 U.S. at 85 (Scalia, J., dissenting)).  *Morales* itself says the opposite, *see* 527 U.S. at 64 n.35 (plurality opinion), and Defendants cite

no case of this or any other court suggesting *Dobbs* has any relationship to

vagueness, *see McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013–15 (5th

Cir. 2023) (applying the ordinary vagueness test, without reference to

*Dobbs*, and addressing substantive due process separately).  For good

reason: "Vagueness doctrine represents a procedural, not a substantive,

demand," and "concerns with substantive due process should not lead us

to react by withdrawing an ancient procedural protection compelled by the

original meaning of the Constitution."  *Sessions v. Dimaya*, 584 U.S. 148, 191

(2018) (Gorsuch, J., concurring in part and concurring in the judgment).

Regardless, under any plausibly relevant standard, Plaintiffs

established the liberty interests that the Act's standardless sweep

jeopardizes—a showing Defendants never challenged below.  *See*

ROA.206–07.  As Plaintiffs explained there, it was settled a century ago that

"[f]reedom of speech and of the press . . . are among the fundamental

personal rights and 'liberties' protected by the due process clause of the

Fourteenth Amendment," *Kay v. White*, 286 F. Supp. 684, 686 (E.D. La. 1968)

(quoting *Gitlow v. New York*, 268 U.S. 652, 666 (1925)).  And "Supreme

Court decisions amply support," too, "the proposition that there is a general right to go to or remain on public property for lawful purposes." *Vincent v. City of Sulphur*, 805 F.3d 543, 548 (5th Cir. 2015). But under the Act, any officer may criminalize the exercise of those rights for any reason or no reason, whenever Plaintiffs' reporters pass within 25 feet. Because a person "may stand on a public sidewalk . . . only at the whim of any police officer" the statute is void for vagueness. *Shuttlesworth*, 382 U.S. at 90.

B. The Act fails to provide members of the public and the press
<u>fair warning of the conduct that will prompt an order to retreat</u>.

The District Court also concluded that the Act would be independently void for vagueness because it fails to "provide fair notice to the public as to what will prompt an order to retreat and thus the public is not on notice of what behavior to avoid," ROA.363 (citing *Morales*, 527 U.S. at 58–59 (plurality opinion)). Though Defendants never address the issue separately, *see* Defs.' Opening Br. at 36–44, 47, their answer seems to be that the (arbitrary) order itself is notice enough—that any "problem [that] is created by a law that criminalizes conduct people normally believe to be innocent is solved when persons receive actual notice from a police order

of what they are expected to do." *Morales*, 527 U.S. at 58 (plurality opinion). But again that theory is foreclosed by *Morales* and *Shuttlesworth*.

As *Morales* explained, "an order cannot retroactively give adequate warning of the boundary between the permissible and the impermissible." *Id.* at 59. In other words, as other courts have explained, a dispersal-order statute must provide "warning about the behavior that *prompts* a lawful dispersal order," *Bell*, 697 F.3d at 462 (emphasis added), not just notice of what to do after an order is received, *see also id.* (due process requires notice of what "conduct may legitimately invite a dispersal order"). Otherwise, on Defendants' theory, a statute that read 'do what any police officer tells you to do' would provide fair notice, despite reducing the public's legal obligations to pure, unpredictable discretion. *But see Shuttlesworth*, 382 U.S. at 93 (a statute criminalizing a person's "refus[al] or fail[ure] to comply with any lawful order, signal or direction of a police officer" would, read literally, raise "constitutional doubts of the utmost gravity").

The Act falls short on just that ground. Lawmakers told neither officers nor the public which of the countless individuals who come within

25 feet of an officer each day, for innocent purposes and to exercise First Amendment rights, should be ordered to retreat on pain of arrest and prosecution.  Defendants' own brief reflects the confusion:  They suggest both that anyone can tell what Louisiana intended to discourage—being within 25 feet of an officer, *see* Defs.' Opening Br. at 40–41—and that the law has never been (and may never be) enforced against that conduct, *see id.* at 19, 27.  In other words, approaching within 25 feet is lawful except when an officer decides in the unknowable exercise of his discretion that it isn't, and whether Plaintiffs will be ordered to retreat the next time they approach is a pure roll of the dice.  That problem permeates every application of the Act, which is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

*  *  *

This is not, it bears underlining, "a case where further precision in the statutory language is either impossible or impractical."  *Kolender*, 461 U.S.

at 361.  To address the vagueness of its original 25-foot law, Indiana has since adopted a narrower statute that tethers an order to an officer's reasonable belief "that a person's presence . . . will interfere with the performance of the law enforcement officer's duties."  Ind. Code § 35-44.1-2-15.  Florida, similarly, recently adopted a 25-foot law limited to individuals who approach with the intent to "[i]mpede or interfere with" the performance of an officer's duties.  Fla. Stat. § 843.31(2)(a)(1).  Any of those standards (and others besides) would inform both officers and the public who should be ordered to retreat and who should not.  But what Louisiana may not do, consistent with due process, is leave that *legislative* judgment to the arbitrary discretion of each and every individual officer.

Those basic principles decide this case—even without reference to the Act's First Amendment harms.  *See Morales*, 527 U.S. at 52–53 (plurality opinion) (noting that the ordinance invalidated as void-for-vagueness did not regulate First Amendment activity and was not overbroad in a First Amendment sense).  The District Court's injunction should be affirmed.

### III.    The Act violates the First Amendment.

Though the District Court grounded its injunction on its vagueness

analysis, the record in this case also makes clear the Act poses an "ever-

present potential for arbitrarily suppressing First Amendment liberties."

*Shuttlesworth*, 382 U.S. at 91.  Those harms to the freedoms of speech and of

the press would provide an independent basis to affirm, whether this

Court reviews the statute on its face or as applied to the newsgathering

Plaintiffs' journalists carry out within 25 feet of officers every day.

A.     The Act violates the First Amendment as applied to Plaintiffs'
       <u>peaceful, nonobstructive newsgathering in public places</u>.

When Plaintiffs' journalists approach within 25 feet of peace officers

to take photos, record audio, or speak to sources, they engage in activity

protected by the First Amendment.  As other courts of appeals have

explained, because "the First Amendment protects conduct and activities

necessary for expression," it likewise protects "approaching" a

newsworthy event in order "to carry out plaintiffs' protected monitoring

and recording."  *Brown*, 86 F.4th at 779; *see also Nicodemus*, 137 F.4th at 663–

64 (Indiana's buffer law "is . . . subject to First Amendment scrutiny" on its

face because it restricts access to public fora and inevitably burdens

individuals attempting to document police).  And as the Tenth Circuit observed in the context of policing in particular, "since the First Amendment protects the right to criticize police, then <u>a fortiori</u> it protects the right to remain in the area to be able to criticize the observable police conduct," because if "police could stop criticism or filming by asking onlookers to leave," then law enforcement officers could simply "bypass the Constitution."  *Jordan*, 73 F.4th at 1169–70 (citation omitted).

Defendants invite this Court to open a lopsided circuit split by insisting that law-enforcement orders trigger no First Amendment scrutiny at all—that the law is "a movement restriction, not a speech restriction." Defs.' Opening Br. at 50.  But Defendants' distinction has no stakes:  Every court to address the issue, including the Supreme Court, agrees that police orders to move directly implicate the First Amendment even when they make no reference to speech or recording on their face.  *See Shuttlesworth*, 382 U.S. at 90–91 (statute making it "unlawful for any person to stand or loiter upon any street or sidewalk . . . after having been requested by any police officer to move on" posed an "ever-present potential for arbitrarily

suppressing First Amendment liberties"); *see also, e.g.*, *World Wide St. Preachers Fellowship v. Town of Columbia*, 245 F. App'x 336, 341–42 (5th Cir. 2007) (order to move demonstration subject to First Amendment scrutiny).[6]

The Supreme Court's decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), on which *Nicodemus* relied in rejecting the very argument Defendants make here, makes the point clear. There, a Massachusetts law that prohibited "knowingly enter[ing] or remain[ing]" within 35 feet of health care facilities was challenged by plaintiffs who wanted to "approach[]" in order to speak to patients. 573 U.S. at 471–72. The Supreme Court explained that even though the law "sa[id] nothing about speech on its face," it necessarily "restrict[ed] access to traditional public fora and [was] therefore subject to First Amendment scrutiny." *Id.* at 476. So too here—or else, on Defendants' theory, any individual officer in

---

[6]     *See also, e.g.*, *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (First Amendment scrutiny applied to "officers' directives to keep moving"); *Reed v. Lieurance*, 863 F.3d 1196, 1211–12 (9th Cir. 2017) (same); *Hulbert v. Pope*, 70 F.4th 726, 733–34 (4th Cir. 2023) (same); *Pouillon v. City of Owosso*, 206 F.3d 711, 717–18 (6th Cir. 2000) (same).

Louisiana could decide to create their own pop-up copy of the abortion buffer in *McCullen*, and the First Amendment would have nothing to say. At the very bare minimum, the Act regulates the 'place' of Plaintiffs' First Amendment activity—not within 25 feet of an officer—and must face intermediate scrutiny. *See Nicodemus*, 137 F.4th at 663–64; *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (when law enforcement officers "adopt time, place, and manner restrictions" on recording police, "those restrictions must be narrowly tailored to serve a significant governmental interest" (citation and internal quotation marks omitted)).

The District Court correctly found that the Act cannot survive intermediate scrutiny because it reflects no effort to tailor the statute's scope to Louisiana's asserted interests, *see* ROA.345–46—an issue on which Defendants bear the burden, *see Siders*, 123 F.4th at 301. Though Defendants recite a litany of interests they believe the Act advances, *see* Defs.' Opening Br. at 56–57, the Act's text pegs an officer's authority to none of them—the trigger for the power to issue an order is presence within 25 feet, period, regardless whether that presence has any nexus to

safety, obstruction, witnesses, arrests, victim privacy, or the like.  Nor have

Defendants attempted to show that Louisiana "seriously undertook to

address the problem with less intrusive tools . . . that other jurisdictions

have found effective," *McCullen*, 573 U.S. at 494, or explained why

"available generic criminal statutes" do not address its interests, *id.* at 492.

That silence sounds especially loud given that Louisiana's garden-variety

obstruction statute would already cover the conduct of someone who

physically interferes with officers while attempting to film them, *see Terrell*

*v. Allgrunn*, 114 F.4th 428, 436–37 (5th Cir. 2024), which leaves the Act with

nothing to do but burden *non*obstructive First Amendment activity.

Just as important, the Act is not narrowly tailored because bare

proximity to an officer—absent some further obstructing behavior—does

not justify restricting First Amendment rights, as this and other courts have

consistently found.  As recently as *Perkins v. Hart*, No. 22-30456, 2023 WL

8274477 (5th Cir. Nov. 30, 2023), this Court expressly addressed "[h]ow

close is 'too close' such that the filming, however well-intentioned,

becomes hazardous," *id.* at *7 (citation omitted).  And there, this Court

concluded that a bystander who was "just a few feet away," *id.* at *8 (Ho, J.,

dissenting), was "not too close" and therefore had a clearly established

right to film, *id.* at *7 (majority opinion).  Other courts have reached the

same result.  *See Glik v. Cunniffe*, 655 F.3d 78, 80, 84 (1st Cir. 2011)

(individual filming from "roughly ten feet away" was at "a comfortable

remove" (citation omitted)); *Ariz. Broads. Ass'n v. Brnovich*, 626 F. Supp. 3d

1102, 1106 (D. Ariz. 2022) (restriction on filming within eight feet not

narrowly tailored).  And remarkably, the record here is entirely silent on

the question of why Louisiana picked a 25-foot forcefield in particular; the

state submitted no evidence of any kind in support of its chosen distance,

an issue on which again it bears the burden.  *See Siders*, 123 F.4th at 306.

Finally, even if the statute were otherwise narrowly tailored to a

significant interest, it would need to "leave[] open ample alternative

channels of communication."  *Id.* at 308 (citation omitted).  "[A]udio and

audiovisual recording are uniquely reliable and powerful methods of

preserving and disseminating news," and it is "highly unlikely that other

methods could be considered reasonably adequate substitutes," *Alvarez*,

679 F.3d at 607.  Here, Defendants have never disputed that 25 feet is too great a distance to record audio or conduct interviews, which would suffice to find that alternative channels are not available.  *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377–78 (1997) (15 feet is beyond "normal conversational distance"); *see also McCullen*, 573 U.S. at 488–89 (where plaintiffs seek to engage others in "one-on-one communication," shouting from a distance is not an adequate alternative (citation omitted)).  And with respect to images or video, Defendants never offered anything but *ipse dixit* for the proposition that Plaintiffs' journalism is not impaired—no basis to gainsay their reporters on the limits of their equipment, *see, e.g.*, ROA.136; ROA.147, and yet again an issue on which Defendants bore the burden but submitted no record evidence of any kind, *see Siders*, 123 F.4th at 308.

To all of this, Defendants once more respond with a citation to *Nicodemus*.  But *Nicodemus* makes clear that the Seventh Circuit's conclusion turned on its finding that Indiana's statute cannot be used "to order a person to move *away*," 137 F.4th at 662, avoiding the risks associated with "'floating' buffer zones" the Supreme Court has previously

condemned, *id.* at 670 (citing *Schenck*, 519 U.S. at 377–79).  And as already explained above, Louisiana's statute cannot bear that construction. *Compare* Ind. Code § 35-44.1-2-14 (individual violates the statute by approaching "after the law enforcement officer has ordered the person to stop approaching"), *with* La. Rev. Stat. § 14:109(A) (individual violates the statute by approaching "after the peace officer has ordered the person to stop approaching *or to retreat*" (emphasis added)).  That steers Defendants headlong into *Schenck*, which makes clear that "floating buffer zones burden more speech than necessary" for exactly the reasons Plaintiffs and the District Court offered, 519 U.S. at 379—it would be virtually impossible in practice for either officers or Plaintiffs to know if their reporters, in attempting to remain 25 feet away from officers, in fact strayed within 24 or 23 feet, especially on scenes with multiple officers, *see id.* at 378–79 & n.9.

That Defendants never attempt to defend the text of the law Louisiana in fact adopted—forfeiting any suggestion that it could survive First Amendment scrutiny unless this Court rewrites it to fit *Nicodemus*—makes the flaw stark.  The District Court correctly held that the Act flunks

intermediate scrutiny and violates the First Amendment as applied.

B.    <u>The Act violates the First Amendment on its face</u>.

Finally, the Act likewise violates the First Amendment on its face under any plausibly relevant degree of scrutiny, an alternative ground for affirming the injunction.  Despite concluding that the Act could not survive intermediate scrutiny, the District Court dismissed Plaintiffs' facial First Amendment claim because of what it saw as two uncertainties: whether Plaintiffs adequately pleaded which of the law's applications were unconstitutional for purposes of an overbreadth analysis, *see* ROA.348–52, and whether the Supreme Court's cases condemning "unbridled discretion in a government official over whether to permit or deny expressive activity" apply outside the context of permitting.  *City of Lakewood*, 486 U.S. at 755.  But any doctrinal ambiguity on those points is more semantic than substantive—the Act violates the First Amendment on its face for much the same reasons that it violates the First Amendment as applied to Plaintiffs.

On the first point, the District Court appears to have confused two senses of "overbreadth," a phrase "not used only to describe the doctrine

that allows a litigant whose own conduct is unprotected to assert the rights of third parties," but also "to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored" to its ends. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965–66 n.13 (1984). This is the latter class of case—Plaintiffs' own First Amendment rights are directly at issue, and the statute implicates the First Amendment on its face, *see Nicodemus*, 137 F.4th at 663–64—on which footing this Court has held that applying intermediate scrutiny "will usually obviate the need to analyze the different requirement that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Doe I v. Landry*, 909 F.3d 99, 111 (5th Cir. 2018) (citation and internal quotation marks omitted).

In other words, the same considerations that prompted the District Court to conclude that the Act fails intermediate scrutiny in analyzing Plaintiffs' as-applied challenge should have produced the same result for Plaintiffs' facial challenge. *See Siders*, 123 F.4th at 306–07 (emphasizing that

"narrow-tailoring analysis" does not "hinge[] on the facial versus as-applied nature of the claim"). *Nicodemus*, a facial challenge, further confirms the point, approaching the question of the Indiana law's constitutionality through intermediate scrutiny rather than by counting up hypothetical applications. But regardless, comparing "the number of unconstitutional applications" to "the total number of possible applications," *Moody v. NetChoice, LLC*, 603 U.S. 707, 780 (2024) (Alito, J., concurring), makes the Act's unconstitutionality just as clear. Because the law contains no standards of any kind to channel officers' discretion towards the interests Defendants assert, the set of possible applications that the Act authorizes consists overwhelmingly of illegitimate uses—an officer issues an order because it is Monday, because "he had a bad breakfast," Recording of Oral Arg. at 30:02, *Reporters Comm. v. Rokita*, *supra*, and so on.

The District Court's reluctance to use the formula "unbridled discretion" was likewise unnecessary. "Although the [unbridled-discretion] doctrine originated with cases involving grants of power to executive officials to determine whether or not to grant licenses to engage

in expression at all, it has subsequently been held to apply to a wider range of burdens on expression," *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (internal citation omitted), including in the context of discretionary law-enforcement policies, *see id.* As early as *Thornhill v. Alabama*, the Supreme Court made clear the dangers posed by standardless licensing regimes are likewise "inherent in a penal statute" that "readily lends itself to harsh and discriminatory enforcement." 310 U.S. at 97. And it would be odd in the extreme to suggest—as Defendants seem to suggest—that the First Amendment has no objection to a statute assigning police officers unbridled discretion to regulate speech. But regardless, the point is academic: For the reasons already canvassed above, the Act fails an ordinary application of intermediate scrutiny, with or without reference to any distinctive features of the Supreme Court's unbridled-discretion cases.

Ultimately, whatever the form of words used, the First Amendment complements what due process already makes clear. A statute that "says that a person may stand on a public sidewalk . . . only at the whim of any police officer" violates the Constitution, *Shuttlesworth*, 382 U.S. at 90,

whether because it provides for "government by the moment-to-moment opinions of a policeman on his beat," *id.* (citation omitted), or because of "its ever-present potential for arbitrarily suppressing First Amendment liberties," *id.* at 91. The Act poses just that danger—including to the newsgathering Plaintiffs carry out within 25 feet of police officers every day. This Court should affirm the District Court's preliminary injunction.

## IV. The District Court's preliminary injunction was otherwise proper.

Finally, Defendants contest the remaining preliminary-injunction factors and the scope of the District Court's order. On the first front, where First Amendment rights are at stake, "likelihood of success on the merits"—already "arguably the most important factor" in the analysis, *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023)—is typically dispositive because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and "[i]njunctions protecting First Amendment freedoms are always in the public interest," *Book People, Inc.*, 91 F.4th at 341 (citations omitted). Under any provision of the Constitution, for that matter, "neither [the State] nor

the public has any interest in enforcing a regulation that violates federal law," *id.* (citation omitted) (alteration in original).  And Louisiana retains, too, ample other tools to protect public safety against conduct that in fact interferes with law enforcement or threatens public safety.  *See Reporters Comm.*, 751 F. Supp. 3d at 947–48 (same in enjoining Indiana's buffer statute).  The equities therefore decisively favored preliminary relief.

The scope of relief was likewise appropriate.  As this Court recently reiterated in upholding a statewide injunction, "the scope of the remedy is determined by the nature and extent of the constitutional violation."  *Roake*, 2025 WL 1719978, at *20 (quoting *Milliken v. Bradley*, 418 U.S. 717, 744 (1974)); *see also NetChoice*, 603 U.S. at 723 (a law "may be struck down in its entirety" where a facial challenge establishes that it has no valid applications).  Here, Plaintiffs established that the Act has no valid applications because every use provides for "government by the moment-to-moment opinions of a policeman on his beat."  *Shuttlesworth*, 382 U.S. at 90 (citation omitted).  The District Court granted appropriate relief.

# CONCLUSION

For the reasons herein and in the District Court's opinion, Plaintiffs

respectfully urge this Court to affirm the District Court's preliminary

injunction and reverse the dismissal of Plaintiffs' facial First Amendment

claim.

Dated: June 26, 2025                             Respectfully submitted,

                                       */s/ Grayson Clary*

                                       Grayson Clary
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: (202) 795-9300
Facsimile: (202) 795-9310
gclary@rcfp.org

Scott L. Sternberg
La. Bar No. 33390
M. Suzanne Montero
La. Bar No. 21361
STERNBERG, NACCARI & WHITE, LLC
935 Gravier Street, Suite 1800
New Orleans, LA 70112
Phone: (504) 324-1887
Facsimile: (504) 534-8961
scott@snw.law | suzy@snw.law

*Attorneys for Plaintiffs-Appellees Deep South Today*, d/b/a *Verite News*, *Gannett Co., Inc., Gray Local Media, Inc., Nexstar Media, Inc., Scripps Media, Inc., and TEGNA Inc.*

Katie Townsend
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Phone: (213) 229-7839
KTownsend@gibsondunn.com

*Attorney for Plaintiff-Appellee Deep South Today*, d/b/a *Verite News*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 32.2 because it contains 12,988 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Cir. R. 32.2 and Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it is set in 14-point Palatino Linotype, a proportionally spaced typeface, and was prepared using Microsoft Word for Mac (version 16.78).

Date: June 26, 2025

/s/ Grayson Clary
Grayson Clary
*Counsel of Record for*
  *Plaintiffs-Appellees*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS

**CERTIFICATE OF SERVICE**

I, Grayson Clary, do hereby certify that I have filed the foregoing

Brief for Plaintiffs-Appellees/Cross-Appellants electronically with the Clerk

of the Court for the United States Court of Appeals for the Fifth Circuit

using the appellate CM/ECF system on June 26, 2025.

I certify that all participants in this case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.


Date: June 26, 2025

*/s/ Grayson Clary*
Grayson Clary
*Counsel of Record for*
  *Plaintiffs-Appellees*
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS